[No. 19272. Department One. October 16, 1925.]

VICTOR ARONSON, as Administrator of the Estate of Senobia Aronson, Deceased, Respondent, v. THE CITY OF EVERETT, Appellant.[1]

WATERS AND WATER COURSES (87)—PUBLIC SUPPLY—INJURIES FROM POLLUTION — PLEADING — COMPLAINT — SUFFICIENCY. In an action against a city for wrongful death through the negligent pollution of its city water supply causing typhoid fever, it is not necessary that the complaint specify the cause and place of the pollution, where it is alleged that the waters became polluted and that the officers had notice, or by the exercise of reasonable care should have known of it.

SAME (87)—PUBLIC SUPPLY—NEGLIGENCE—PURITY OF SUPPLY. A city does not act in a governmental capacity in furnishing water to its citizens; and while it does not impliedly warrant the purity of its water, it is liable for negligence in permitting it to be polluted.

[1]Reported in 239 Pac. 1011.

EVIDENCE (213)—OPINION EVIDENCE—EXAMINATION OF EXPERTS—
HYPOTHETICAL QUESTIONS. In an action for the pollution of a city
water supply, in connecting the city water with a polluted source
and protecting it only by a gate in a by-pass which permitted the
pollution in case of low city pressure or the opening of the gate,
it is not error to exclude a hypothetical question to a witness calling
for his opinion as to whether the construction was done in an ordi-
nary workmanlike manner; since there was no issue as to the work-
manlike manner of the construction, but only as to the matter of
negligently allowing the by-pass to remain with the gate valve open.

SAME (213). Evidence that the husband of the deceased, who
died from typhoid fever, was afflicted at the same time, and that
he used "city water," is proof that deceased was afflicted by the
use of city water within the district in question, sufficient to form
the basis of a hypothetical question to an expert.

APPEAL (454)—REVIEW—HARMLESS ERROR—EVIDENCE. In an ac-
tion against a city for wrongful death through negligently causing
a typhoid epidemic in a certain district using city water, any error
in basing a hypothetical question upon evidence of a list of afflicted
persons using the water in the district and stricken with typhoid, is
harmless where there was other evidence of a large number of
afflicted persons so using the water in the district.

WATERS AND WATER COURSES (87)—PUBLIC WATER SUPPLY—POLLU-
TION—DAMAGES—EVIDENCE—SUFFICIENCY. A verdict against a city
for wrongful death through negligently causing a typhoid epidemic
is sustained by proof that city authorities had notice of complaints
and protests as to the pollution of the water for some months before
the epidemic broke out.

DEATH (27, 32)—ACTIONS FOR CAUSING DEATH—EVIDENCE—DAM-
AGES—LOSS OF SOCIETY. In an action for the wrongful death of a
wife, the mother of two children, three and six years of age, re-
covery may be had for the "loss of care, protection, support . . .
and instruction and training of the mother," without proof of any
instruction given by her, where the children were living with her
at home in the usual family relation.

SAME (35)—DAMAGES—MEASURE AND AMOUNT—TIME OF DEPEND-
ENCY OF MINORS. In an action for the wrongful death of a mother,
leaving children three and six years of age, in which it appears that
her expectancy of life was over thirty years, it is not error to fail
to fix the time for which the minors could recover on the date of
their reaching majority.

SAME (37)—WRONGFUL DEATH—EXCESSIVE DAMAGES. In an action
for the death of a wife, leaving two children, three and six years

of age, it is not excessive to award a verdict of six thousand dollars, divided equally between the husband and the two children.

APPEAL (425)—REVIEW—HARMLESS ERROR—ERROR AFFECTING SUBSTANTIAL RIGHTS. Error, if any, in allowing $13, interest on a verdict for $6,000, prior to entry of the judgment, O. K.'d as to form by appellant's attorneys, is too insignificant to justify a reversal of the judgment.

Appeal from a judgment of the superior court for Snohomish county, Bell, J., entered July 7, 1924, upon the verdict of a jury rendered in favor of the plaintiff, in an action for wrongful death. Affirmed.

*O. Duncan Anderson* and *J. W. Dootson,* for appellant.

*Sherwood & Mansfield,* for respondent.

ASKREN, J.—This is an appeal from a judgment in the sum of $6,000, entered upon the verdict of a jury in an action for damages for the death of Senobia Aronson, alleged to have died from typhoid fever contracted by drinking contaminated water furnished by the appellant, city of Everett.

Many errors are assigned by appellant. It is first claimed that the complaint did not state a cause of action. The complaint charged that the city of Everett was engaged in the business of supplying water for domestic and drinking purposes to the citizens and inhabitants thereof for a consideration; that, during the month of July, 1923, the water so furnished became impure, unwholesome, polluted and dangerous to the life and health of the citizens; that said condition was known to the defendant, its officers and agents who were charged with the duty of keeping and maintaining the water in a pure condition, or with the exercise of reasonable care and inspection would have known, but that, notwithstanding the condition of the water and the knowledge or means of knowledge thereof, the

city of Everett carelessly and negligently furnished such water for a period of six weeks prior to August 14, 1923, and that deceased, Senobia Aronson, did drink and use the water for domestic purposes and became sick of typhoid fever, which resulted in her death on the 30th day of August, 1923.

It seems to be contended by appellant that there should be some allegation as to the specific cause of pollution of the water, or some charge that, after the water became polluted, the city failed to notify its users to boil the water. As to the last contention, it is sufficient to say that, if the water became polluted and this fact was known to the city, and the city thereupon notified the users to boil the water, that is a matter that should be set up by way of a defense, for the plaintiff would not be required to negative such matter by his complaint. Nor do we think it necessary that the complaint should specify the cause or place of pollution of the water. Having alleged that the water became polluted and that the officers of the city had notice, or in the exercise of reasonable care should have known of it, and such water was furnished to the users, and that one of such users as a result thereof contracted a disease and died, it would seem that a good cause of action for negligence was stated.

Appellant also insists that the complaint was drawn on the theory of an implied warranty, and argues strenuously that the city in furnishing water to its users does not guarantee its purity and wholesomeness. Reliance is had upon *Canavan v. Mechanicville*, 229 N. Y. 473, 128 N. E. 882, 13 A. L. R. 1123, and *Green v. Ashland Water Co.*, 101 Wis. 258, 77 N. W. 722, 70 Am. St. 911. While both cases hold that a city furnishing water to its inhabitants does not impliedly warrant that the same is pure and wholesome, yet both of these

cases recognize that the failure to properly inspect the water so as to keep it free from contamination is negligence. There is ample authority that a city engaged in furnishing water, electricity or other kindred services to its inhabitants for a profit is liable for negligence the same as any private corporation engaged in the same business; that the city does not act in a governmental capacity, and that there is an implied warranty that the water is fit for human consumption. *Hayes v. Torrington Water Co.*, 88 Conn. 394, 92 Atl. 406; *Jones v. Mt. Holly Water Co.*, 87 N. J. Law 106, 93 Atl. 860; *Hamilton v. Madison Water Co.*, 116 Me. 157, 100 Atl. 659, Ann. Cas. 1918D 853.

As to which rule should be adopted, it is not necessary for us to determine in this action, since we hold the complaint is based upon the ground of negligence and not on implied warranty.

It is next claimed that the court erred in sustaining an objection to the testimony of the witness Carver, who was asked a hypothetical question based upon certain facts in the case. The testimony showed that the pollution of the city water came through the mains of the Eclipse Mill Company's plant, which was situated on the Snohomish river. It appears that, prior to April, 1923, that company was connected with the city water system, although it had its own pumping system connected with the river. The water taken by the mill company from the river was not fit for human consumption, and it was not intended that this water should flow into the city mains for use by the inhabitants of the city. There was a series of check valves which were intended to prevent this water getting into the city mains. However, there was a bypass which allowed the water to go through the mains without going through the check valves that had been

installed. There was a gate valve in the by-pass. At that time a new main was installed which connected the dead ends of what are known as Railroad Lateral and Pine Street Lateral. This connection was known as the 34th Street line, and was completed on April 11. The gate valve, known as Gate Valve A, was supposed to be kept closed to prevent water from circulating from the mill through the city mains. In addition to this, the city mains generally carried a higher pressure than the mill company's mains. An epidemic of typhoid fever in Everett during the summer of 1923 finally resulted in an investigation which disclosed that the cause came from the pollution of the water. It was found that the gate valve A was open, and that the pressure in the city mains, temporarily lowered by heavy use of water for sprinkling, was permitting the polluted water to enter the city mains, resulting in typhoid fever.

It was the contention of the city that, at the time the new 34th Street line was connected up in April, 1923, the Eclipse Mill Company had agreed to remove the by-pass, and that the new pipe line was put in for the purpose of increasing the volume of water for the benefit of the mill and to secure a complete circulatory system throughout. The witness Carver was then asked to assume that the city had made arrangements to put this new line in, and the mill company had secured the right of way and the lumber for the purpose of enclosing the pipe, and the manager of the mill company had agreed that he would remove the by-pass, and that the different detailed connections were on the property of the mill company, and then to say whether or not, in his opinion, the work was done in an ordinary workmanlike manner. Objection was made to this on the usual grounds, and upon the further grounds that

it invaded the province of the jury and was not a matter for expert testimony. The court, in sustaining the objection, said it did not feel that there was any question of workmanlike manner. The court was correct in this ruling. No issue was then before the jury as to whether or not the work was done in a workmanlike manner. The question as to whether this connection was made at the request of the mill company, or that they paid a part of the cost, or whether they had agreed to remove the by-pass, or whether a part or all of the valves and pipe lines were upon the mill company's property, were not matters material to the issue. It was not contended by complainant that the work was not done in a workmanlike manner, but that it was negligence for the by-pass to be left there when there was no need for it, especially with the gate valve open. The officers of the city did not seriously contend that this by-pass should not have been removed.

It is also claimed that the court erred in permitting the testimony of Dr. Putnam, who treated at least one of the users of the water who became sick with typhoid. The witness was shown a list containing the names of a large number of persons alleged to have been sick with typhoid fever. He was also shown in connection with this a list of water connections showing that all of these persons were users of the city water. There was then propounded to him a hypothetical question which, among other facts, assuming that all of these patients within a certain described district drank city water during the period of the incubation, and that they all contracted typhoid fever, what opinion he would arrive at with regard to the cause of Senobia Aronson's illness, she being one of the persons so listed and coming within the district so mentioned and being a user of the water supplied by the city. The

objection to this question seems to be that there was no evidence that Senobia Aronson drank any of the city water. But her husband, who was plaintiff in the action, testified that he was afflicted at the same time as his wife, and when asked "where did you get your water," answered, "city water."

It is also claimed that there was no sufficient evidence that all of the other persons who contracted typhoid and whose names were on the list shown to the doctor were using city water during the period of incubation, but there is in the record testimony of a large number of persons so using this water and who were made sick therefrom, so that even though the list contained the names of some who were not sworn as witnesses it could hardly be said to be more than harmless error.

Complaint is also made that the court should have granted judgment notwithstanding the verdict. There was evidence in the case showing that complaint had been made to the city officials as early as May about the smell of the water, its appearance, and that persons were made sick therefrom, and these protests and complaints were made continuously up until the time that a regular pandemic existed. Without detailing the evidence we think it sufficient to say that there was a conflict therein which required submission to the jury.

It is urged that error was committed by the court in an instruction given to the jury concerning the items of recovery. The deceased left a husband and two minor children—one three and another six years of age. In that instruction the court permitted recovery for any pecuniary loss which a fair preponderance of the evidence showed the minor children would sustain by reason of "the loss of the care, protection, support,

earnings, services and the physical, moral and intellectual instruction and training of the mother, which, under the evidence, she would have rendered them during the period of minority.'' It is urged that there is no evidence to show that the decedent had given or would give to the children any physical instruction or training, or any moral instruction or training, or that the children lost by her death any earnings of the mother. But we think it not necessary that witnesses should testify as to what moral or physical instruction a mother has given to her child, but where the record discloses that the children are living at home with the mother, and all the circumstances indicate that the mother is raising her children in the usual way, such care and instruction naturally flow from the relation. The instruction seems to be in harmony with our former decisions in *Walker v. McNeill,* 17 Wash. 582, 50 Pac. 518; *Rochester v. Seattle, Renton & Southern R. Co.,* 67 Wash. 545, 122 Pac. 23, 39 L. R. A. (N. S.) 1156, and the same in 75 Wash. 559, 135 Pac. 209.

It is also claimed that the court should not have fixed the time for which the minors should recover as the date when they would reach their majority, upon the ground that the jury should determine the probable length of life of the decedent and fix that as the time. But the record shows that decedent's expectancy was something over thirty years, so that upon the record the minors were entitled to expect care and support at least during the years of their dependency.

Appellant offered instructions which in part cover the objection made to the instruction given. These were refused. In view of our ruling upon the instruction given, we hold that there was no error in refusing appellant's requested instructions.

It is next contended that a new trial should have been granted because of excessiveness of the verdict. The $6,000 verdict was divided by the jury, $2,000 to the surviving husband, and $2,000 to each of the children. It is plain from the record that the husband has been deprived of the services of his wife for a period in excess of thirty years. Just what that loss will be it is very hard to estimate, but certainly we cannot say that $2,000 is excessive. As to the children, the loss of the care, protection, instruction and sustenance that each of them would in all probability have received from their mother up to the age of majority is even more difficult of ascertainment. Such amounts must be left in very large degree to the discretion of the jury. It would be impossible with the amount of money allowed by the jury to purchase for them that which they have lost by the death of the mother, and which the law seeks to compensate them for. It follows, therefore, that the award was not excessive.

Finally, it is contended that the court in entering judgment caused interest on the same to run from the date of the verdict rather than the date of the entry of the judgment. The amount of this error, if it is one, is $13. The judgment was O.K.'d as to form by appellant's attorneys and it would appear to be a question raised for the first time in this court. We think, under the authority of *Thompson v. Coe,* 96 Conn. 644, 115 Atl. 219, this claim of error is not well taken. In that case a like issue was presented to the court and disposed of as follows:

"The interest could not on the most technical view, have been as much as $3, and we do not think for this small sum the case should be sent back even for the correction of the judgment. That amount is too petty,

and it further does not appear that the attention of the court was called to the point of interest."

In *Brown v. Town of Southbury*, 53 Conn. 212, 1 Atl. 819, where the judgment entered carried interest from the date of the injury to the date of the judgment, the interest for such period amounting to $10.59, the court in that case said:

"This amount is too insignificant to justify us in reversing the judgment and granting a new trial."

It follows, therefore, that the judgment is right and should be and is affirmed. It is so ordered.

TOLMAN, C. J., and PARKER, J., concur.

MITCHELL, J. (concurring)—I concur except that interest should run only from the date of the entry of the judgment.